THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN CLEMONS, Defendant-Appellant.

First District (3rd Division)   No. 77-591

Opinion filed May 30, 1979.—Rehearing denied June 29, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and Stephen D. Ferrone, Assistant State's Attorneys, of counsel), for the People.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

John Clemons and his brother, Leroy Clemons, were indicted for the murder of Clarence Phennesse (Ill. Rev. Stat. 1971, ch. 38, par. 9—1) and the armed robbery of Glenda J. Browne and Freddie Andrews (Ill. Rev. Stat. 1971, ch. 38, par. 18—2). Leroy Clemons was tried separately. John Clemons was examined by the Psychiatric Institute of the Circuit Court of Cook County on April 19, 1973. He was diagnosed as suffering from schizophrenia, paranoid type with severe depression, and was not competent to stand trial at that time. Periodic re-examinations of the Psychiatric Institute resulted in similar conclusions. On May 27, 1975, he was found mentally fit for trial. Following this report, the State proceeded to trial.

Clemons was convicted by a jury of murder and of two counts of armed robbery. He was sentenced to terms of 14 to 30 years in the penitentiary on the murder charge and of 4 to 14 years on each of the armed robbery charges, with the sentences to run concurrently. Clemons now appeals his convictions, raising two issues for review: whether the trial court committed reversible error in preventing his medical witnesses from testifying as to the contents of reports prepared by other persons, and whether the trial court erred in limiting his cross-examination of the State's medical expert witness and in denying the defendant access to the reports which this witness had in his possession.

The evidence introduced by the State at trial showed that on January 5, 1973, at approximately 11:30 p.m., John Clemons and his brother, Leroy, were at a cocktail lounge in Chicago. Suddenly John Clemons, holding a revolver, confronted Freddie Andrews, the security guard at the lounge, and announced a robbery. John Clemons took the guard's revolvers and wrist watch and forced him to lie on the floor. At this time, Leroy was standing near the air-conditioner, holding a gun. There was a shot and Clarence Phennesse, a customer who had been sitting in a booth near the air-conditioner, stumbled from the bar out to the street. Phennesse later died from "multiple pellett or bebe shots that * * * penetrated the right chest wall causing laceration or penetration of the heart and right lung."

Following the shooting, John and Leroy fled. On a nearby street they encountered Glenda Browne, who was parking her automobile. John and Leroy commandeered the car and drove off.

At approximately 5:18 p.m., on January 7, 1973, Officer Elmer Atkinson of the Chicago Police Department, arrived at the scene of an automobile accident in the vicinity of 87th Street and Ingleside Avenue in Chicago. The officer found Browne's automobile resting against the center post of a railroad viaduct. Recognizing the car as the subject of a January 5th police broadcast, the officer arrested Clemons and the other five individuals who were at the scene of the accident.

Following his arrest the defendant made both an oral and written statement to an assistant State's attorney. In these statements, he admitted participating in the events at the lounge and in the subsequent robbery of Browne's car. He also admitted that he was in Browne's automobile at the time of the accident.

The defendant offered an insanity defense. Celita Clemons, the defendant's mother, testified as to the events of his youth. She stated that he entered the Marine Corps at the age of 17. He served with the Marines in Viet Nam and was wounded in the leg. His mother testified that when he left the Marines in 1970 he was depressed and unable to hold a job. He married in February 1972, but he and his wife lived together periodically for only about 8 months.

Celita Clemons also related that on October 16, 1972, the defendant fainted in the bedroom of her home. He was taken to the hospital where he remained for approximately three hours. Following the incident, he lived with his wife for several more weeks but then left to reside with his brother, Leroy. During December 1972, the defendant attempted to secure enough money to rent an apartment for himself and his wife. When his mother saw him around January 4, 1973, he appeared to be depressed and she suggested to him that he consult a doctor.

The defendant's wife testified that during their marriage he was excessively jealous and constantly accused her of being unfaithful. On Christmas Day, 1972, she met her husband at her mother's home. She stated that she was pregnant at the time and she lied to the defendant, telling him that he was not the child's father. She saw the defendant again on January 4, 1973, at which time she refused a reconciliation with him.

Michael Radd testified that he was in the Marine Corps at the same time as the defendant and that he observed the defendant in three combat situations. On each occasion, the defendant acted with complete disregard for his own safety.

The defendant also presented the testimony of psychiatrists, psychologists and physicians. Dr. William Hamby testified that he was the associate director of the intensive care unit at South Shore Hospital on

October 16, 1972, when the defendant was admitted for emergency treatment. Dr. Hamby identified the records compiled pursuant to Clemons' visit and stated that he had no independent recollection of the incident. However, since only a portion of the entries in these records were entered by Dr. Hamby, he was permitted to testify only that he had recommended treatment for Clemons based upon a diagnosis of drug abuse.

Dr. Donald Paull, an assistant public defender and a clinical psychologist, testified that on February 25, 1974, he examined Clemons. At that time, Dr. Paull was employed by the Psychiatric Institute of the Circuit Court of Cook County. Based on the facts contained in a report of the examination, he stated that it was his opinion that on the examination date, the defendant was suffering from schizophrenia, schizo-affective type.

Dr. Gerson Kaplan, a psychiatrist, testified that while employed by the Psychiatric Institute, he examined the defendant on March 29 and April 19, 1973. He had no present recollection of the examinations but was allowed to testify from his reports of those examinations. He stated that based upon the facts of each examination, he was of the opinion that on March 29 and April 19, 1973, the defendant was suffering from a mental disease which he described as a schzophrenic reaction, paranoid type with depression. Dr. Kaplan was precluded, however, from disclosing the results of psychological tests, performed by other individuals, which were available to him during the April 19, 1973, examination.

Dr. Baker, a psychiatric consultant of the Cook County jail, testified that he examined the defendant on January 9, 1973. It was his impression that the defendant was depressed.

Dr. Jerome Katz, a psychiatrist, stated that he examined the defendant on March 31, 1976. He further testified that in conjunction with this examination, he read a number of psychological and psychiatric reports compiled by other individuals. Based upon these reports and his examination, Dr. Katz testified that he was of the opinion that, on March 31, 1976, the defendant was schizophrenic, schizo-affective, depressed. Dr. Katz was not permitted to reveal the contents of the reports he examined.

Dr. Katz was also presented a hypothetical question containing the matters introduced into evidence including the history of the defendant, a report of his actions on January 5, 1973, and the results of various psychiatric and psychological examinations of the defendant. Dr. Katz stated that on January 5, 1973, the hypothetical individual was "very probably" suffering from a form of schizophrenia and that while the hypothetical man probably knew he was doing something wrong, he lacked the capacity to conform his behavior to the requirements of the law.

In rebuttal, the State introduced the testimony of Dr. Robert Reifman, a psychiatrist and assistant director of the Psychiatric Institute. In response

to essentially the same hypothetical question that was propounded to Dr. Katz, Dr. Reifman testified that, in his opinion, the hypothetical individual showed no evidence of a mental disease on January 5, 1973.

Prior to beginning his cross-examination of Dr. Reifman, defense counsel noted that he had only just discovered that Dr. Reifman had interviewed Clemons on three prior occasions. He also noted that Dr. Reifman had "reports in front of him" and asked the court for time to examine those documents. Defense counsel indicated that he wished to cross-examine Dr. Reifman by asking him to assume that he had seen the patient on three prior occasions and then to call Dr. Reifman as his own witness on surrebuttal. The court denied the request on the grounds that Dr. Reifman's testimony consisted only of the hypothetical question and that cross-examination would therefore be limited to the facts already in evidence.

The State also presented Dr. Edward Kelleher, the director of the Psychiatric Institute, as a rebuttal witness. He was also of the opinion that based upon the facts in the hypothetical question, the man in question was not suffering from any mental disease on January 5, 1973.

The first issue raised by the defendant is whether the trial court improperly restricted his direct examination of Dr. Hamby, Dr. Kaplan and Dr. Katz, when the court refused to permit these witnesses to disclose the contents of medical reports upon which they based their opinion testimony. The record shows that Dr. Hamby was not permitted to testify as to material in the records from the defendant's visit to the South Shore Hospital on October 16, 1972. Dr. Kaplan was precluded from testifying to the results of certain psychological tests given to Clemons which had been performed by other individuals. Dr. Katz was not permitted to reveal the opinions contained in medical reports compiled by other physicians and psychologists which he consulted pursuant to his examination of the defendant. Clemons contends that under *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, he had a right to have this material disclosed to the jury.

■■■ In *Ward* the defendant, who was charged with murder, raised an insanity defense. During rebuttal, the State presented the testimony of Dr. Edward J. Kelleher, director of the Psychiatric Institute of the Circuit Court of Cook County, who stated his conclusion that the defendant was not suffering from any mental disease. This opinion was based, in part, upon the report of an examination of the defendant conducted by Dr. Reifman which Dr. Kelleher "supervised." As part of his testimony Dr. Kelleher was permitted to read from the report of Dr. Reifman stating his opinion that the defendant was sane at the time of the offense. Following cross-examination, defense counsel urged that all of the records relied upon by Dr. Kelleher be admitted into evidence. On appeal before the

supreme court, the defendant contended that he was denied his right to confrontation with the person who performed the tests upon which Dr. Reifman relied, and, therefore, Dr. Reifman's report was impermissible hearsay. The supreme court stated that normally medical reports compiled by others who have not testified would not be admitted into evidence. However, since defense counsel had urged the admission of Dr. Reifman's report into evidence and the record included his report, the court concluded that no error was committed in permitting the introduction of Dr. Kelleher's opinion testimony. The court then went on to conclude that "even if these reports had not been admitted into evidence, there would not have been error in the propriety of Dr. Kelleher expressing his opinion as to the defendant's sanity predicated, in part, upon these reports." (*Ward*, 61 Ill. 2d 559, 566.) Commenting on *United States v. Partin* (5th Cir. 1974), 493 F.2d 750, and Rule 703 of the Federal Rules of Evidence (Fed. R. Evid. 703), the supreme court noted that the trend in other jurisdictions was to permit expert opinion testimony despite the fact that such testimony was based in part upon facts not otherwise in evidence. The court then overruled its prior decision in *People v. Black* (1937), 367 Ill. 209, 10 N.E.2d 801, "insofar as [that decision] applies to the admission of expert medical opinion as to an accused's sanity based, in part, on medical or psychological records compiled by others which are not admitted into evidence." (61 Ill. 2d 559, 568.) Then the court continued:

> "If such reports are of a type customarily utilized by the medical profession, then these reports may be used as factors by an expert in the determination of his opinion as to an accused's sanity even though the reports are not admitted into evidence." (61 Ill. 2d 559, 568.)

However, the *Ward* opinion does not hold that any facts or reports relied upon by an expert witness are admissible in evidence. The medical reports compiled by other, nontestifying individuals which the defendant's expert witness relied upon remain inadmissible hearsay evidence on direct examination. (Ill. Rev. Stat. 1977, ch. 38, par. 115—5(c)(1); Ill. Rev. Stat. 1977, ch. 110A, par. 236(b).) While we are aware that the court in *Smith v. Williams* (1975), 34 Ill. App. 3d 677, 339 N.E.2d 10, a civil case, relying upon the authority of *Ward*, held that a medical report prepared by a physician not called to testify was admissible as an exception to the hearsay rule, we are not persuaded by its reasoning and we, therefore, do not accept this decision as a proper application of *Ward*. (See Spector, *People v. Ward: Toward a Reconstruction of Expert Testimony in Illinois*, 26 DePaul L. Rev. 284, 291 (1977).) The trial court correctly allowed the defendant's experts in this case to express their opinions based on reports of others not

in evidence; at the same time, it did not err in precluding testimony on direct examination disclosing the conclusions and results set forth in those reports or in ruling against their admissibility.

The second issue raised by Clemons is that the trial court erred in restricting his cross-examination of Dr. Reifman. The defendant argues that the court should have permitted him to examine the reports which Dr. Reifman had in his possession. Clemons argues that the trial court, in denying his request, erroneously concluded that since the facts contained in these reports had not been previously introduced into evidence, they could not be used in the cross-examination of Dr. Reifman. He also claims he was entitled by *People v. Scott* (1963), 29 Ill. 2d 97, 193 N.E.2d 814, to see any documents used by a witness in anticipation of that witness' testimony. The defendant asserts that in cross-examination of an expert witness, he is allowed to introduce facts which are not in evidence in order to challenge the witness' credibility. However, even assuming the trial court's ruling was technically correct, he suggests that it served to deny him due process of law pursuant to *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.

We do not believe that *People v. Scott* mandates that the defendant has a right to examine the documents. In *Scott* the supreme court concluded that where a witness had used a document to refresh his recollection prior to trial, the opponent had a right to examine the document for the purpose of cross-examining the witness. In the present case there is no indication that the documents were used by Dr. Reifman to refresh his recollection. The only testimony he offered was an opinion as to the defendant's sanity based upon a hypothetical question. There is no indication that his personal knowledge was an additional basis of his opinion.

■■ We find that the trial court's conclusion that the reports did not provide appropriate material for cross-examination of Dr. Reifman did not constitute reversible error. While a wide latitude should be allowed on the cross-examination of an expert witness in order to permit the investigation of the foundation of his opinion, the precise scope of such cross-examination lies within the sound discretion of the trial court. *People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224.

In the present case the basis of the witnesses' testimony was the hypothetical question. There was no demonstration that the witness based his opinion, to any degree, upon his prior examinations of the defendant. Dr. Reifman was a rebuttal witness so that the defendant had already had an opportunity to establish the facts which served as the basis of the hypothetical question. Moreover, the court offered to permit the defendant to call Dr. Reifman as his witness for the purpose of making Dr. Reifman's report of his examination of the defendant part of the record. The

defendant never took advantage of these opportunities. Thus, we believe that there was no abuse of discretion in limiting cross-examination of the expert witness to the facts already in evidence.

■ These same considerations convince us that the restrictions placed upon the defendant in cross-examining Dr. Reifman do not so reduce "the integrity of the fact-finding process" (*Chambers v. Mississippi* (1973), 410 U.S. 284, 295, 35 L. Ed. 2d 297, 309, 93 S. Ct. 1038) that Clemons was denied due process of law.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

SIMON, P. J., and McNAMARA, J., concur.