BETTY J. MARTIN, Plaintiff-Appellant, v. ALAN J. ZUCKER, M.D. *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 84—1241

Opinion filed May 28, 1985.

Ellis E. Reid & Associates, Ltd., of Chicago, for appellant.

Francis D. Morrissey, Norman J. Barry, Jr., and Michael J. Wagner, all of Baker & McKenzie, of Chicago, for appellees.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff-appellant, Betty J. Martin, brought this medical malpractice action against two physicians, defendants-appellees Alan J. Zucker and Marcia Siegal. Plaintiff alleged that defendants needlessly and negligently performed a dilatation and curettage (D & C) procedure resulting in injury to her. The jury returned a verdict for the defendants and against the plaintiff. The trial court denied plaintiff's post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Plaintiff appealed.

Plaintiff Betty J. Martin gave birth to a daughter on December 20, 1978, at Mary Thompson Hospital in Chicago. After her discharge on December 23, plaintiff noticed that she was still bleeding from her vagina. On January 2, 1979, she noticed that the blood "started flowing real heavy, and I was passing blood clots, and I got scared." Plaintiff told her eldest daughter to call the Chicago fire department, which took her to the emergency room at the University of Illinois Hospital.

Plaintiff was admitted about 9:30 p.m., and she was seen at about 11 p.m. by defendant Alan J. Zucker, a first-year medical resident. Dr.

Zucker examined plaintiff and noted that she had discharged about 30 cc's of blood with clots and that her vital signs were normal. Dr. Zucker diagnosed plaintiff's condition to be the result of retained products of conception, *i.e.*, placenta that had not been discharged during birth. He administered oxytocin, which is used to contract the uterine muscles and control bleeding. When the oxytocin failed to stop the bleeding, Dr. Zucker concluded that a D & C would be required. Dr. Zucker called his supervisor, defendant Marcia Siegal, a third-year resident, who agreed with the diagnosis. Dr. Zucker performed the D & C at about 2 a.m. During the operation, Dr. Zucker noticed that the bleeding continued, and he called Dr. Siegal to the operating room because he suspected that he had perforated the uterus. Dr. Zucker also concluded that he had cut an artery, which can be life-threatening.

An exploratory laparotomy was performed to examine the extent of the damage, and the uterus and the right uterine artery were repaired. Plaintiff was discharged from the hospital on January 10, 1979. She returned as an outpatient on January 23 because she was still in some pain and was spotting. Two days later, she saw another physician, Percy Moss, and on January 29 was admitted to Cabrini Hospital, where she discovered that she had a bladder infection. Plaintiff was released on February 6, and she continued to see Dr. Moss until November 1982.

On December 24, 1980, plaintiff filed the present action. Trial began on March 26, 1984, and ended on March 30. The trial was a classic battle of experts. Plaintiff's theory, presented through her expert, Dr. William Matviuw, was that perforation of the uterus was negligence *per se*. Plaintiff's attorney summed up Dr. Matviuw's testimony as follows: Plaintiff's condition was stable and no emergency existed; Dr. Zucker's diagnosis was wrong; the D & C was the wrong course of treatment and it was negligently done; and all of this was the proximate cause of plaintiff's injuries.

The defense's expert, Dr. Gerald I. Zatuchni, testified that the perforation of the uterus, particularly after a birth, is a recognized complication and that there was no breach of the standard of care. He also testified that the diagnosis was correct, that the D & C was the proper course of treatment, and that it was performed properly and within the standard of care.

The jury returned a verdict in favor of the defendants. Plaintiff's post-trial motions were denied, and this appeal followed.

The issues presented for review are:

(1) Whether the trial court erred when it refused to allow plaintiff

to read to the jury the contents of a nursing note that was part of the medical records at the hospital.

(2) Whether the trial court erred when it refused to allow plaintiff to read to the jury excerpts from medical textbooks.

(3) Whether the trial court erred when it ordered the plaintiff to alter a chart that was used during closing argument.

(4) Whether the trial court abused its discretion when it denied plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

I

Plaintiff's first point is that the court erred when it refused to let the plaintiff read the contents of a nursing note. The note read:

"1/3/79 12:45 a.m. ... pad #2 in place, #1 saturated with bright red blood and small clots.

Jacqueline Patterson, R.N."

Plaintiff argues that the note impeaches the testimony of Dr. Zucker, who testified that the plaintiff had discharged about 30 cc's of blood when he first examined her. He later testified that plaintiff lost about 500-600 cc's of blood in the 4½ hours before the D & C. Plaintiff argues that the note impeaches Dr. Zucker's testimony and should have been admitted.

■■ The admission of medical records is governed by Supreme Court Rule 236(b) (94 Ill. 2d R. 236(b)), which reads, in part:

"Rule 236. Admission of Business Records in Evidence
***

(b) Although medical records or police accident reports may otherwise be admissible in evidence under the law, subsection (a) of this rule does not allow such writings to be admitted as a record or memorandum made in the regular course of business."

The rule has been interpreted to mean that hospital records are admissible if a proper foundation has been laid, but they generally are not admissible without the testimony of the person who made the notation. (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 1097, 410 N.E.2d 266, *appeal denied* (1980), 81 Ill. 2d 602.) The result of the foundation requirement is that hospital records can be admitted as a hearsay exception only if the records are cumulative of the in-court testimony of one who has personal knowledge. E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 803.11, at 578 (4th ed. 1984).

■■ Under these rules, the trial court did not err in refusing to let plaintiff read the contents of the note for three reasons: (1) there

was no foundation; (2) Dr. Zucker did not rely on the note in his testimony; and (3) plaintiff objected to the defense's reference to the note.

As to foundation, the record shows that the nurse who signed the note, Jacqueline Patterson, was unsuccessfully subpoenaed and never testified at trial. Hence, there could be no authentication of the note. See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 192, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.

Secondly, Dr. Zucker did not rely on the note in his testimony, so the note could not be introduced for impeachment purposes. Plaintiff relies on the following colloquy:

"Q. Now Doctor, all the documents that make up my client's hospital charts are relied upon by physicians such as yourself in order to deliver quality medical care.

A. Yes, sir. We depend upon medical records."

This broad statement could encompass the nursing note; later, however, plaintiff's counsel chose not to pin down Dr. Zucker specifically:

"Q. Doctor, did you change my client's sanitary napkin?

A. No, sir.

Q. Do you have any personal knowledge of her sanitary napkin?

A. From the nursing notes?

Q. No, from your own personal knowledge.

A. No, sir.

Mr. Reid: Thank you. No further questions."

This exchange shows that there was no reliance on the nursing note for Dr. Zucker's testimony, so the note could not have been used for impeachment.

■ Plaintiff also relies on the fact that the defense's expert, Dr. Zatuchni, referred to "nurse's notes" during his testimony. Plaintiff tacitly relies on *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, for her argument that "Dr. Zatuchni relied upon that note in forming his opinion." However, the *Wilson* court held that "it is unnecessary for hospital records to be admitted in order to elicit an expert medical opinion." (84 Ill. 2d 186, 192.) The *Wilson* decision " 'deals with testimony of experts based upon medical records not with the admission of the records themselves.' " (*Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 866, 452 N.E.2d 680, *appeal denied* (1983), 96 Ill. 2d 558, quoting *Thompson v. Lietz* (1981), 95 Ill. App. 3d 384, 391, 420 N.E.2d 232.) Moreover, the " 'medical reports compiled by other, non-testifying individuals which the [plaintiff's] expert witness relie[s] upon remain inadmissible hearsay evidence on direct examination.' " (*Bailey v. City of Chicago* (1983), 116 Ill. App. 3d

862, 866, quoting *People v. Clemons* (1979), 72 Ill. App. 3d 860, 865, 391 N.E.2d 128.) As one commentator has said, " '[t]here is a clear distinction between data that is trustworthy enough to qualify as an exception to the hearsay rule, and data that is inadmissible but usable by experts arriving at an opinion because it is relied upon by experts in the field.' " (*Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 866, quoting Spector, *People v. Ward: Toward a Reconstruction of Expert Testimony in Illinois*, 26 DePaul L. Rev. 284, 291 (1977).) Thus, the fact that Dr. Zatuchni relied on the note does not mean that it is admissible; a proper foundation was still required.

Lastly, plaintiff objected when defense counsel asked Dr. Zucker what the nursing note indicated. At a sidebar, plaintiff's counsel argued that the note was hearsay when he said, "Well, you see Judge, he [defense counsel] can't offer this for the truth of the matter—I'm going to object to that as hearsay. You're going to have to bring the nurse in." On appeal, plaintiff's attorney argues, somewhat unconvincingly, that he thought they were referring to a note entered after the operation.

In sum, the court did not err in refusing to admit the note into evidence because there was no proper foundation.

## II

Dr. Zucker was called as an adverse witness by plaintiff under section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). Plaintiff complains that portions of certain learned medical treatises are at odds with portions of Dr. Zucker's testimony. She sought to have this fact published to the jury by having Dr. Zucker read aloud from portions of the treatises.

The record revealed that the trial court and plaintiff's counsel agreed on precisely how plaintiff's counsel could properly conduct the adverse examination of Dr. Zucker with the learned treatises. Dr. Zucker was to read the requested portions of the texts silently. Counsel for the plaintiff was then to ask him if he had deviated from the treatment prescribed in the text. If the witness answered "yes," counsel could then go into the text, so that the witness could explain his deviations. If the witness responded that he did not deviate from the text, then plaintiff's expert would be used to publish the text.

After this agreement was reached out of the presence of the jury, the examination of Dr. Zucker resumed. He read silently the excerpts from the texts and testified that he agreed with them. Plaintiff's counsel continued his examination.

"Q. Okay. Now, you're aware, are you not, that when the

bleeding is moderate, it probably will be controlled by Ergonovine; isn't that correct?

A. No, sir.

Q. What did you say?

A. No, sir.

Q. Well, you read this text, did you not, Doctor, and doesn't it say here—

MR. BARRY: Objection, your honor. This is why we had the sidebar.

BY MR. REID: Q: I don't say what it says. Read this, Doctor, to yourself, right there starting from that word 'if.'

Friedman's test says that Ergonovine will control moderate bleeding, doesn't it?

MR. BARRY: Objection, your Honor, to Mr. Reid['s] reading the text.

THE COURT: Let's have a brief sidebar."

The court then stated, "I thought we had this all worked out." After another explanation by Mr. Reid, more bickering ensued between counsel. Finally, Mr. Reid said:

" 'I'll stay away from the text, Judge. I don't think I needed the text, but I wanted to tie it into the text because he just said he agreed with the text, and he hadn't deviated from the text. ***

THE COURT: Okay. Tomorrow morning, do we have the text again, or does that come up when the expert comes up? I want to do a little research myself.

MR. REID: This will be the end of the text until my expert."

■ Plaintiff's counsel did not object to the proposed adverse examination arrangement and did not make any offer of proof showing how he would impeach Dr. Zucker through the learned treatises' use. In the absence of any objection or ruling, Illinois courts repeatedly have refused to speculate about what the evidence might have shown. (*People ex rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 438 N.E.2d 924; *Snedden v. Lavenka* (1981), 92 Ill. App. 3d 979, 416 N.E.2d 1097.) Thus, plaintiff has waived her *post facto* criticism of the trial court's handling of the matter because she failed to properly preserve the question for appellate review.

The scope of cross-examination is within the trial court's discretion, and reviewing courts are reluctant to disturb the decision of the trial court absent a clear showing of an abuse of discretion that resulted in manifest prejudice to a party. *People v. Coles* (1979), 74 Ill. 2d 393, 385 N.E.2d 694; E. Cleary and M. Graham, Handbook of Illi-

nois Evidence sec. 611.11, at 393 (4th ed. 1984).

The record does not reveal a clear abuse of discretion but, on the contrary, shows that the court worked with plaintiff in structuring a method of using the medical treatises.

### III

Plaintiff did not receive a bill from the defendants, Dr. Zucker and Dr. Siegal, nor from the hospital with which they were affiliated. Counsel for plaintiff prepared a chart for use in final argument that had a question mark after the names of the physicians and University of Illinois Hospital. Because no bills were admitted into evidence, the court ordered the question marks to be removed.

The defense objected to the use of the chart because "[t]he only reason for this [the question marks] is to imply to the jury that in this case no bill was given to the plaintiff for the services rendered because there was something done wrong." Plaintiff responded that she had served a subpoena on the University of Illinois but that its witness did not produce a bill. The court sustained the objection because there was no way for a jury to assess damages for bills that had not been received. Plaintiff's counsel persisted:

> "MR. REID: But, Judge, before you sustain it, isn't it an admission against interest if you give me free services, and that's my point. I am not going to bulge [sic] on that. I want it because it's an admission against interest by all these people with the zeros.
>
> THE COURT: That's exactly the terrible inference the jury might draw, and I don't think there is any evidence."

Generally, the use of a chart during closing argument is within the discretion of the trial court. (*Brown v. G & M Distributors, Inc.* (1984), 122 Ill. App. 3d 435, 441, 461 N.E.2d 95.) The use of exhibits to illustrate a closing argument is proper as long as the exhibits are not misleading to the jury. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1024-25, 343 N.E.2d 65, *appeal denied* (1976), 63 Ill. 2d 552.) The exhibits, like closing argument itself, cannot be based on facts not in evidence. 3A Nichols' Illinois Civil Practice sec. 3579.1, at 283 (rev. ed. 1977).

During a discussion in chambers, defendants acknowledged that they did not submit bills and would not submit any in the future. Counsel for defendants also represented that he was authorized by the University of Illinois Hospital to assure the court and plaintiff that the hospital did not, and will not, submit a bill.

In the medical malpractice case of *Sawicki v. Kim* (1983), 112 Ill.

App. 3d 641, 445 N.E.2d 63, the defendant, Dr. Kim, reduced his bill after plaintiff was discharged from the hospital. In his opening statement to the jury, plaintiff's counsel said, "This, I believe the evidence will show is tantamount to admission of liability." (112 Ill. App. 3d 641, 644.) On appeal, a verdict for the plaintiff was reversed and a new trial ordered. The appellate court said, "In furtherance of the policy of encouraging assistance to an injured party, the Illinois General Assembly has specifically provided that evidence of the providing of, or the payment for medical services, or the offer to pay for or to provide such services is not admissible in evidence, ***. *** Counsel's further comment that defendant 'reduced her bill' also comes within the statutory prohibition against admission of evidence of payment for medical services. (See Ill. Rev. Stat. 1979, ch. 51, par. 61.)" 112 Ill. App. 3d 641, 645-46.

It is clear that plaintiff's counsel could not properly leave question marks on the damages chart to suggest "an admission against interest." By refusing to permit the question marks, the trial court avoided, rather than committed, prejudicial error.

### IV

■ A very stringent standard has been set for reviewing a motion for judgment notwithstanding the verdict. It is well-established that a judgment notwithstanding the verdict should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

Although the denial of plaintiff's motion for judgment notwithstanding the verdict has been raised as an error, it was neither briefed nor argued by plaintiff on appeal. The disputed evidence from which the jury reached its verdict does not warrant the substitution of the judgment of the court for that of the jury. The trial court correctly denied plaintiff's motion.

In the alternative, plaintiff moves for a new trial. "A motion for new trial is addressed to the discretion of the trial court, and its decision will not be disturbed unless there is a clear abuse of discretion that affirmatively appears on the record." *Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 1087, 401 N.E.2d 1145.

The appellate court has also noted that a " 'verdict based on conflicting evidence should not be disturbed on appeal unless it is contrary to the manifest weight of the evidence.' *** A verdict is consid-

ered to be against the manifest weight of the evidence only when the opposite conclusion is clearly evident [citations], or when the jury's verdict is palpably erroneous [citation] or appears to be unreasonable, arbitrary, and not based on the evidence [citation]." *Gabrenas v. R. D. Werner Co.* (1983), 116 Ill. App. 3d 276, 284-85, 451 N.E.2d 1307.

■ As previously stated, the trial was a classic battle of experts. The jury had all of the facts before them. It was aware of the dispute as to the amount of blood lost by plaintiff prior to surgery. It chose to believe defendants' expert who testified that accepting the lowest figure on loss of blood (30 cc's with clots) constituted an "enormous amount of blood" loss and justified the surgery. The jury also found that the surgery was performed properly. Even the information from medical treatises was brought out by the experts. We, therefore, conclude that the verdict was not against the manifest weight of the evidence.

■ Finally, plaintiff also sought to impeach the verdict with an affidavit filed by Harold Markham, an associate of plaintiff's attorney. The affidavit stated that four jurors would have decided the case differently had they known the contents of the nursing note.

Affidavits concerning the subjective mental processes of a juror cannot be used. (*Allen v. Dhuse* (1982), 104 Ill. App. 3d 806, 810, 433 N.E.2d 356.) As Justice Brennan (presently Justice of the United States Supreme Court) of the New Jersey Supreme Court pointed out:

> "The better reasoned decisions support the exclusion of jurors' testimony as to their mental processes, not upon the discredited basis of the policies against self-stultification and avoidance of jury tampering, perjury or other fraudulent practices, but upon the sounder ground that, being personal to each juror, the working of the mind of any of them cannot be subjected to the test of other testimony, and therefore that such testimony should not be received to overthrow the verdict to which all assented." (*State v. Kociolek* (1955), 20 N.J. 92, 99-100, 118 A.2d 812, 816, quoted in *Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 240, 386 N.E.2d 134.)

Because the use of the affidavit was improper, it should not serve as the basis for a new trial.

Accordingly, for the reasons stated herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P.J., and HARTMAN, J., concur.