DOROTHY B. MAYER, Adm'r of the Estate of Emil J. Mayer, Deceased, Plaintiff-Appellant, v. WALTER BAISIER, Defendant-Appellee (Raymond Pearson *et al.*, Defendants).

Fourth District   No. 4—85—0753

Opinion filed September 3, 1986.

Timothy W. Kelly, of Jerome Mirza & Associates, Ltd., of Bloomington, for appellant.

Gary M. Peplow, of Heyl, Royster, Voelker & Allen, of Peoria, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

As administrator of the estate of Emil J. Mayer, Dorothy B. Mayer brought this wrongful death action in the circuit court of Sangamon County against defendants, Walter Baisier, Raymond Pearson, and St. John's Hospital (hospital), alleging medical malpractice. During a trial before a jury, defendant Pearson was dismissed following his testimony on motion by the plaintiff. At the close of plaintiff's case in chief, the remaining two defendants moved for directed verdicts. After hearing arguments on the motions, the trial court directed verdicts in favor of defendant Baisier and defendant hospital. Plaintiff now appeals from the judgment of the circuit court directing a verdict in favor of defendant Baisier, contending that she established a *prima facie* case of medical malpractice against Baisier and, therefore, the trial court's judgment should be reversed. For the following reasons, we affirm the judgment of the trial court.

On October 14, 1977, Emil J. Mayer, the decedent, was admitted to St. John's Hospital in Springfield in order to undergo a "total left hip replacement" operation. On October 18, 1977, Walter Baisier, an orthopedic surgeon, performed the hip-replacement operation on decedent. On December 31, 1977, approximately 10 weeks after his surgery, decedent died as a result of massive sepsis or an overwhelming infection.

Thereafter, on December 31, 1979, plaintiff, Dorothy Mayer, as administrator of the decedent's estate, brought a wrongful death action against decedent's internist, Raymond Pearson, his orthopedic surgeon, Walter Baisier, and the hospital for alleged medical malpractice. Count I of plaintiff's three-count complaint alleged that defendant Baisier was negligent in "one or more of the following respects":

"(b) Allowed the decedent to receive the drug "coumadin" an anticoagulant daily from October 18, 1977 through October 23, 1977, so that a massive hemorrhage into the operative site was produced; a tremendous hemotoma [*sic*] thereupon developed in the operative site which eventually became infected;

(c) Permitted the removal of a hemovac on the basis of a previously typed order sent to the hospital before the patient's operation, when had the hemovac been left in place it could of [*sic*] removed some of the tremendous amount of blood from the hemorrhage into the operative site;

\* \* \*

(e) Essentially abandoned the decedent after the operation; from the date of surgery, October 18, 1977, he did not see the decedent until November 18, 1977; *** and generally through abandoning the patient failed to provide proper and adequate medical care and treatment to him."

A jury trial commenced on October 2, 1985. During trial, plaintiff introduced the testimony of six members of the decedent's family and three physicians. Two of the physicians who testified were defendant Pearson, decedent's first internist, and Dr. Victor Lary, the pathologist who performed the decedent's autopsy. Plaintiff also introduced the deposition testimony of Dr. Theodore Massell, who testified as an expert in the area of general surgery.

Plaintiff called Dr. Pearson to testify as an adverse witness. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1102.) Pearson testified that the decedent first came to his office in June or July of 1977, suffering from pain in his hip. After several visits, decedent informed Pearson that he was going to be hospitalized in St. John's Hospital during which time Dr. Walter Baisier would perform a total hip replacement. Decedent asked Pearson to "handle his internal medical care" during his hospitalization.

Pearson testified that he saw the decedent almost daily following the October 18, 1977, surgery, until he was discharged from the case on October 25, 1977. Three days after the operation, Pearson learned from the hospital chart that decedent was experiencing diarrhea. Pearson prescribed medication for the diarrhea and performed several stool cultures. Then on the morning of October 25, 1977, Pearson observed that decedent's physical condition was worsening. He appeared weak, was unable to eat and was diaphoretic, i.e., perspiring. Further, the diarrhea had become more severe, his hemoglobin was falling, and his white blood count was high, indicating an infection. Pearson was concerned with these findings and entertained several possibilities of internal medical problems. Following his examination of decedent that day, Pearson learned the plaintiff had discharged him from the case and that he was being replaced by another internist. That was the last time Pearson saw the decedent.

During the time Pearson was treating decedent, he did not see or speak with Dr. Baisier personally regarding decedent's condition. Pearson's treatment, as the internist, only included a visual check of the bandaged operative site. From the standpoint of an internist, he believed that decedent's "orthopedic condition" was satisfactory during the time he was seeing the patient.

Following his testimony, Pearson was dismissed as a defendant in

the cause, on plaintiff's motion.

Dr. Victor Lary, a pathologist, was also called to testify by the plaintiff. Dr. Lary testified that on December 31, 1977, he performed an autopsy on the decedent. When examining the operative site of the hip replacement he observed infected tissue. He could also see that two operations had been performed subsequent to the hip replacement, in an effort to drain or decompress the infection. Following an examination of decedent's body and a review of his hospital records, he concluded that decedent died of an overwhelming bacterial infection. While Dr. Lary made several nonspecific pathologic findings, he was unable to determine the exact origin of the infection.

Plaintiff also introduced the deposition testimony of Dr. Theodore Massell, taken May 20, 1982. Dr. Massell, board certified in general surgery, testified as plaintiff's expert witness. His testimony was based exclusively upon his review of decedent's hospital records and autopsy report, which were not offered into evidence.

In Massell's opinion, decedent's first internist, Dr. Pearson, improperly prescribed an anticoagulant medication known as Coumadin, which led to a tremendous hemorrhage into the area of the operation. The hemorrhage then caused a hematoma, or large collection of blood, which led to an abscess or infection at the operative site. He believed that this infection "contributed significantly" to decedent's death. From the records, he determined that Dr. Pearson also prescribed certain antibiotics, thought to possibly produce an infection of the colon known as pseudomembranous enterocolitis. This, he believed, could have contributed to decedent's death.

With respect to defendant Baisier, the orthopedic surgeon, Massell testified that the notations in the hospital records indicated:

> "Dr. Daisier [sic] apparently did not see Mr. Mayer but on one occasion from the 18th of October to his death on the 31st of December. I consider that very definitely and strongly a deviation below the accepted standard of care."

In his opinion, due to Dr. Baisier's "lack of seeing the patient," he failed to discontinue the anticoagulant Coumadin at the proper time. Massell also believed that Dr. Baisier allowed a hemovac, or drainage tube, to be removed from the operative site prematurely, pursuant to pretyped standing orders. Finally, Massell testified that decedent died of an overwhelming infection but that there were "differences in interpretation" as to the origin of the infection.

Additionally, plaintiff introduced the testimony of six family members. Several of the family members testified to spending a considerable amount of time at the hospital, some spending the night in the

hospital waiting room on occasion. They observed decedent's condition deteriorate as his infection became more severe. Only the plaintiff spoke with Baisier or actually saw him in the decedent's hospital room. Members of the family did discuss decedent's condition with the internists and several residents that treated him.

At the close of plaintiff's case, the remaining two defendants, Dr. Baisier and the hospital, moved for directed verdicts. After a hearing, the trial court directed verdicts in favor of both defendants, concluding that plaintiff failed to establish a *prima facie* case. Plaintiff now appeals only from the judgment entered in favor of Dr. Baisier.

■■ Because plaintiff challenges the trial court's granting of a motion for a directed verdict in favor of defendant Baisier, this court must view all evidence presented and make all possible inferences therefrom in a manner most favorable to the plaintiff. The trial court's judgment should be affirmed only if the evidence so overwhelmingly favors the defendant that no contrary judgment based on the evidence could stand. *Mort v. Walter* (1983), 98 Ill. 2d 391, 457 N.E.2d 18; *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

■■ In a negligence malpractice case, the plaintiff has the burden to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 242-43, 489 N.E.2d 867, 872; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, 282; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05.) Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 242-43, 489 N.E.2d 867, 872.) If the plaintiff fails to produce a required element of proof in support of her cause of action, then no cause is presented for the jury's consideration and the entry of a directed verdict for the opposing party is proper. *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216; *Alton v. Kitt* (1982), 103 Ill. App. 3d 387, 431 N.E.2d 417.

Plaintiff introduced the deposition testimony of Dr. Massell in an attempt to prove the three allegations of Baisier's negligence. Dr. Massell's expert testimony, based exclusively upon the decedent's hospital records and autopsy report, was allowed under Federal Rule 703

(Fed. R. Evid. 703; see 28 U.S.C. app. sec. 711 (1982)). Through this testimony, plaintiff sought to establish that (1) because the hospital records contained only two notations by Baisier and his nurse following the surgery, then Baisier could have seen the decedent on no other occasions, thereby abandoning decedent; (2) *according to the* hospital records, Baisier improperly allowed decedent to receive the drug Coumadin and permitted a drainage tube to be removed from the operative site; and (3) assuming these facts to be true, such conduct constituted a deviation from the standard of proper post-operative care and treatment. The trial court ruled that although Massell's testimony regarding the contents of the hospital records was admissible as opinion testimony under Rule 703, it was not substantive evidence of Baisier's negligence.

Plaintiff first contends on appeal that because Massell's testimony as to the contents of the records is "clearly admissible," it should, therefore, be considered substantive evidence, sufficient to establish a *prima facie* case of negligence, pursuant to the holding in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322. It is plaintiff's position that *Wilson* not only permits an expert to discuss hearsay data in explaining the basis for his opinion, but that *Wilson* also allows this testimony to convert the underlying hearsay data into substantive evidence.

Plaintiff's argument misapprehends the *Wilson* holding. The *Wilson* court held that due to the high degree of reliability of hospital records, an expert may render an opinion based on facts contained in those records, even if the records themselves are not in evidence. In so holding, the *Wilson* court expressly adopted Rule 703 of the Federal Rules of Evidence. The rule states:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.)

(See 28 U.S.C. app. sec. 711 (1982).) The rationale of the supreme court in adopting Rule 703 was essentially one of promotion of judicial efficiency within the bounds of fairness to the respective parties. The court pointed out the extreme inefficiency of a system requiring an attorney to produce and examine all the authenticating witnesses. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193-94, 417 N.E.2d 1322, 1326.

■ Contrary to plaintiff's assertions, however, the *Wilson* decision "deals with testimony of experts based upon medical records, not

with the admission of the records themselves." (*Thompson v. Lietz* (1981), 95 Ill. App. 3d 384, 391, 420 N.E.2d 232, 237.) A review of the decisions interpreting *Wilson* reveals that the trial court properly permitted Massell to testify that he relied upon decedent's hospital records in formulating his opinion. (*Mohler v. Blanchette* (1982), 106 Ill. App. 3d 545, 435 N.E.2d 1161.) Further, the trial court was correct in allowing Massell to testify to the contents of those records in explaining the basis of his opinion. (*People v. Castro* (1983), 113 Ill. App. 3d 265, 446 N.E.2d 1267; *Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933, 431 N.E.2d 1316; *People v. Rhoads* (1979), 73 Ill. App. 3d 288, 391 N.E.2d 512.) These records, however, compiled by other nontestifying individuals, remained inadmissible hearsay. (*Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 452 N.E.2d 680, *appeal denied* (1983), 96 Ill. 2d 558; *People v. Clemons* (1979), 72 Ill. App. 3d 860, 391 N.E.2d 128.) As one commentator has said, "[t]here is a clear distinction between data that is trustworthy enough to qualify as an exception to the hearsay rule, and data that is inadmissible but usable by experts in arriving at an opinion because it is relied upon by experts in the field." (Spector, *People v. Ward: Toward a Reconstruction of Expert Testimony in Illinois*, 26 DePaul L. Rev. 284, 291 (1977).) Thus, Massell's reliance upon and testimony regarding certain contents of the hospital records was permissible. Contrary to plaintiff's assertions, however, Massell's testimony did not transform the hospital records, either in whole or in part, into substantively admissible evidence. (See *Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 479 N.E.2d 1000; E. Cleary & M. Graham, Illinois Evidence sec. 703.1, at 472 (4th ed. 1984); see also *Smith v. United States* (D.C. Cir. 1965), 353 F.2d 838.) Rather, this testimony was admissible only for the limited purpose of explaining the basis for his opinion. *People v. Anderson* (1986), 113 Ill. 2d 1; *Henry v. Brenner* (1985), 138 Ill. App. 3d 609, 486 N.E.2d 934.

■ This very issue was recently considered in *Henry* wherein the trial court ruled and the appellate court agreed that "the inadmissible hearsay used by [the] expert could be admitted solely to illustrate and explain his opinion. It was not otherwise admissible as evidence." *Henry v. Brenner* (1985), 138 Ill. App. 3d 609, 614, 486 N.E.2d 934, 937.

Similarly, in *People v. Anderson* (1986), 113 Ill. 2d 1, the supreme court indicated that, while the contents of reports relied upon by an expert would "clearly be inadmissible if offered for their truth," the expert may disclose the underlying facts and conclusions "not for their truth but for the limited purpose of explaining the basis for the expert witness' opinion." (113 Ill. 2d 1, 12.) The court anticipated that

"an uninformed jury could misuse this type of information as substantive proof" of the underlying data. (113 Ill. 2d 1, 12.) Thus, the *Anderson* court suggested the utilization of a limiting instruction, advising the jury to consider the underlying data only to evaluate the basis of the expert's opinion. See also *Henry v. Brenner* (1985), 138 Ill. App. 3d 609, 615, 486 N.E.2d 934, 938.

Following the reasoning in *Anderson* and *Henry*, Massell's testimony regarding the contents of the hospital records was admissible only for the limited purpose of explaining the basis for his opinion. His testimony did not establish the truth of that hearsay data and did not convert that data into substantive evidence. Accordingly, Massell's testimony cannot be considered substantive proof of Baisier's alleged negligent conduct, and, therefore, is insufficient to establish a *prima facie* case for negligence.

Plaintiff next contends that the trial court disregarded the testimony of the family members "in its entirety," in determining that plaintiff failed to establish a *prima facie* case of abandonment. As previously indicated, the third allegation in plaintiff's complaint stated that Baisier:

> "Essentially abandoned the decedent after the operation; from the date of surgery, October 18, 1977, he did not see the decedent until November 18, 1977; *** and generally through abandoning the patient failed to provide proper and adequate medical care and treatment to him."

The plaintiff's testimony and that of five other members of decedent's family was introduced at trial in an attempt to substantiate this allegation. Each family member estimated the number of times he or she visited the decedent during the three month period following his surgery. Mike Houregan, decedent's son-in-law, testified that he was "by St. John's [hospital] to see Mr. Mayer *** probably approximately a dozen times." Phyllis Gustafson, decedent's daughter, estimated that she visited the decedent during "forty percent of the time" he was hospitalized. She further testified that she stayed overnight at the hospital on more than one occasion. Mike Mayer, decedent's son, stated that he visited the decedent on two weekends in November and from "around December 14th *** through the end of the month." Lisa Houregan, decedent's daughter, testified to being at the hospital on October 23, 27, 29; from the end of October to November 10, and on November 12 and 15. She further testified to spending the night there on occasion. None of these family members spoke with Baisier or saw him in the decedent's hospital room. Several spoke with decedent's second internist, Dr. Pately. Several also spoke with

Dr. Hargan, Dr. Willis and "a couple of physicians [who] *** were specialists *** looking in on [the decedent]." We are unable to discern from the record what connection these physicians had with the decedent's care, other than that they were in some way involved with his treatment.

Also testifying was Barbara Ann Chausse, decedent's daughter. She stated that she visited the decedent on October 20, 23, 25, 27, 28, and "throughout the second week in November." She also stated that she stayed the night there on two occasions. When asked where the family was located when they stayed overnight at the hospital she indicated "[t]hey have a lounge outside of the intensive care ward, and we stayed in the lounge." Chausse testified that she saw Baisier twice in the hallway, and saw his nurse on one occasion in the decedent's room. She was uncertain of the dates. She further testified that she spoke with Dr. Pately.

Finally, plaintiff, Dorothy Mayer, testified regarding the amount of time she spent at the hospital. She stated that she first visited decedent daily "during normal visiting hours and *** went home in the evening, went to work." She further stated that "during [her] lunch hour [she] would go see Emil, and then after work [she] would be with him until after visiting hours. And then when he became severely ill [she] stayed overnight." She testified that she saw Baisier in decedent's room on October 26 and had a conversation regarding decedent's physical condition. She also spoke with Baisier on December 5 or 6 outside of the decedent's room, concerning a test he had just performed. In addition, she testified to having a telephone conversation with Baisier regarding the replacement of the internist on the case. On a subsequent date, she saw three physicians leaving the decedent's room, became worried, and again spoke with Baisier by phone. This was the last contact that plaintiff had with Baisier. At some point, plaintiff also spoke with Dr. Pearson and Dr. Pately regarding the decedent's condition.

In considering this testimony, the trial court stated:

> "The testimony also indicates that members of the family who were there at various times, who admittedly were not there twenty-four hours a day every day of the hospitalization, say, well, we didn't see him there except I think Mrs. Mayer says maybe twice and talked to him on the phone.
>
> In this Court's opinion, that evidence fails to substantiate a prima facie case."

Plaintiff challenges this ruling as erroneous, arguing that the family member's testimony combined with Dr. Massell's testimony regard-

ing notations in the hospital records was sufficient to establish a *prima facie* case of abandonment. Pursuant to our foregoing discussions, Massell's reference to the contents of the hospital records cannot be considered substantive evidence of Baisier's alleged negligent conduct. Thus, the remaining question is whether the testimony of the family members, as just outlined, is sufficient to support an abandonment claim.

Illinois courts have held that a cognizable claim for abandonment arises where injury results from a physician's "refusal" to treat a patient needing further treatment without giving the patient a reasonable time to find substitute care. (*Magana v. Elie* (1982), 108 Ill. App. 3d 1028, 439 N.E.2d 1319 (and cases cited therein); *Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, 88, 414 N.E.2d 520, 523, *appeal denied* (1981), 83 Ill. 2d 570.) The patient must first allege and prove the physician's refusal of further treatment; whether such refusal constitutes abandonment under the circumstances, then becomes a question of fact. *Magana v. Elie* (1982), 108 Ill. App. 3d 1028, 439 N.E.2d 1319.

■ Based upon our reading of these cases, we conclude that plaintiff has failed to establish a *prima facie* case of abandonment. Here, the family members testified to being at the hospital on various occasions throughout the decedent's three month period of hospitalization. On these occasions, Baisier was seen or spoken with only a few times. There was, however, no testimony, nor any allegation, that Baisier refused to render treatment without giving the decedent a reasonable time to find substitute care. As the plaintiff chose to proceed under a claim of abandonment, yet failed to produce a required element of proof in support of that claim, then the entry of a directed verdict for the defendant was proper. *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.

For the reasons stated, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

McCULLOUGH, P.J., and MORTHLAND, J., concur.